## IN THE MATTER OF ROBERT A. GRIFFITH.

Suffolk. October 9, 2003. - December 9, 2003.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Canons of ethics, Deceit, Disciplinary proceeding, Suspension.

In a bar discipline case, this court, taking into account the primary factor of the effect upon, and perception of, the public and the bar, concluded that a one-year suspension was the appropriate sanction to impose on an attorney who, in the course of representing an estate, failed to make certain important disclosures during discovery and trial concerning the decedent's medical records and treatment, where the attorney's conduct was grave enough to warrant a suspension of some duration, rather than a public reprimand, in that it constituted an intentional misrepresentation and had potential to obstruct justice, but where the attorney eventually disclosed the information, publicity surrounded the published opinion of a Federal trial judge sanctioning the attorney, and the attorney paid a significant monetary fine. [507-510]

INFORMATION filed in the Supreme Judicial Court for the county of Suffolk on March 7, 2003.

The case was reported by *Greaney,* J.

*Robert I. Warner,* Assistant Bar Counsel.

*Thomas R. Kiley* (*Richard A. Gargiulo* with him) for the respondent.

GREANEY, J. This bar discipline case requires us to decide the appropriate sanction to impose on the respondent, who, from 1991 until 1996, in the course of representing the estate of Morris Pina, Jr. (Pina), in a lawsuit against the city of New Bedford (and others) for police misconduct, failed to make certain important disclosures during discovery and trial concerning Pina's medical records and treatment.[1] The Board of Bar Overseers (board) adopted the recommendation of the hearing

---

[1] As the petition for discipline alleged attorney misconduct occurring between 1991 and 1996, the alleged misconduct is reviewed under the Canons

committee that the respondent receive a public reprimand. Dissatisfied with the board's sanction, bar counsel filed, pursuant to § 3.57 of the Rules of the Board of Bar Overseers (2003), a demand for filing of information. Bar counsel seeks a two-year suspension on the grounds that (1) the nondisclosure, or concealment, was intentional, and (2) no mitigating factors exist to warrant the less severe sanction of a public reprimand. The board in turn filed an information with the county court pursuant to S.J.C. Rule 4:01, § 8 (4), as appearing in 425 Mass. 1309 (1997). A single justice reserved and reported the case without decision. We conclude that a one-year suspension is the appropriate sanction to impose.

1. We summarize the findings of fact made by the hearing committee and adopted by the board. The respondent was admitted to the Massachusetts bar in December, 1978. Pina died on June 16, 1990, after being arrested by New Bedford police officers and while in police custody. In early 1991, Delores Gonsalves, Pina's sister, hired the respondent to investigate Pina's death, and, if appropriate, to commence a lawsuit against those responsible for the death.

The respondent was drawn to the case, in part, because of the Cape Verdean heritage he shared with Pina and his perceptions, having grown up in New Bedford, of antagonistic behavior exhibited by New Bedford police officers toward Cape Verdeans. On July 29, 1991, the respondent filed a complaint in the United States District Court for the District of Massachusetts on behalf of Gonsalves, the administratrix of Pina's estate, against the city of New Bedford and other defendants including the mayor, police commanders, patrolmen, and detention attendants. The complaint alleged various Federal and State civil rights violations. The complaint subsequently was amended to add counts for damages arising from Pina's alleged wrongful death, and further amended to add a survival action and a count alleging an intentional cover-up by the defendants.

Trial began on December 7, 1995, and continued for seventy-two days over a three-month period. The jury returned a verdict in favor of Gonsalves and awarded damages of $435,000. Judg-

of Ethics and Disciplinary Rules in effect through December 31, 1997. S.J.C. Rule 3:07, as amended, 422 Mass. 1301 (1996).

ment in that amount subsequently entered. Following trial, the parties entered into a settlement agreement vacating the judgments against the city and the mayor, and requiring the city to pay Pina's estate $555,000.

Before commencing litigation, the respondent learned from bills sent to Pina's mother that Pina had been treated by Dr. Hanumara Chowdri of New Bedford. The respondent sent a request for Dr. Chowdri's treatment records of Pina. On July 2, 1991, the respondent received a response from Dr. Chowdri, which included a record disclosing that Pina had been a patient of Dr. Chowdri at St. Luke's Hospital in New Bedford in May, 1988, and that during that admission Pina had tested positive for human immunodeficiency virus (HIV).

In December, 1991, one of the defense lawyers, Austin Joyce, served interrogatories on Gonsalves (Joyce interrogatories). Interrogatory no. 4 asked Gonsalves to identify "any hospital or institution" to which Pina had been admitted prior to his arrest and to identify "the periods of time and dates during which" Pina was in the hospital or institution. Interrogatory no. 5 asked Gonsalves to "[s]tate the names and addresses of all persons or institutions having custody and control of any of [Pina's] medical records."

On January 8, 1992, Gonsalves answered the interrogatories with the respondent's assistance under the pains and penalties of perjury. The respondent did not object to the interrogatories on any ground, including privilege. Gonsalves's answer to interrogatory no. 4 stated that she had "no knowledge as to whether or not [Pina] was admitted to any hospital or institution for examination or treatment before this alleged incident,"[2] and her response to interrogatory no. 5 was, "See answer to interrogatory no. 4." These answers were false; Gonsalves knew that Dr. Chowdri had treated Pina and that Pina had been a patient at St. Luke's Hospital in May, 1988.[3] Further supplementation of the

[2] Gonsalves's answer did disclose that Pina had been enrolled in several drug treatment programs and specified the names of the treatment centers.

[3] The hearing committee correctly found that, even if the respondent was not aware of Gonsalves's knowledge as to Dr. Chowdri's treatment of Pina or Pina's admission to St. Luke's Hospital, as the agent of the client, the respondent's own knowledge of those facts was imputed to his client, thus

Joyce interrogatories did not change the answer that failed to identify Dr. Chowdri or St. Luke's Hospital.

On January 22, 1992, John Folan, another defense attorney, served a request for documents on Gonsalves, including a request to produce all "medical records, hospital records, charts, and correspondence with any doctor or hospital rendering treatment on behalf of [Pina] for a period of five years prior to" Pina's death. On February 6, 1992, the respondent, without objection, agreed to produce all responsive documents "if and when available." The respondent, however, never produced the records he had received the previous July identifying either Dr. Chowdri or St. Luke's Hospital.

On May 26, 1992, in response to a subpoena duces tecum, Folan received medical records from St. Luke's Hospital, which, at that time, was the only hospital in New Bedford. The records contained an extensive medical history for Pina, but they did not contain any information concerning Pina's HIV status or Dr. Chowdri's treatment of him. The cover sheet accompanying the records noted that portions of the medical record were "further protected" and had been redacted. The defense counsel who saw the redaction notice did not inquire further as to the redacted matters.[4] The respondent was aware that the records received by Folan (and then supplied to all counsel of record) did not contain any information concerning Pina's HIV status or Dr. Chowdri's treatment of Pina.

In response to a pretrial motion in limine to exclude evidence of hedonic damages (damages to compensate for loss of enjoyment of life), the respondent attached a report from an expert economist he retained to testify on damages arising from Pina's alleged wrongful death. The respondent had not told this expert that Pina was HIV positive. The respondent maintained that the expert should be permitted to testify at trial about the "statistical realities of life and health expectancies for an average African-American male of [Pina's] age." The expert had calculated Pina's lost net income at $357,473, and his "total loss of pleasure of life" at $2,069,893.

requiring disclosure of the information or some other appropriate response such as an objection or the invocation of a privilege.

[4]Not all defense counsel received a copy of the redaction notice.

The United States District Court judge assigned to the case heard argument on the motion in limine on December 6, 1995. The respondent proposed to call his expert economist and to rely on life tables showing average life expectancy. Defense counsel objected to the use of life tables on the ground that they were misleading when applied to an intravenous drug user such as Pina. The judge allowed the respondent to offer proof of hedonic damages, but precluded him from calling his expert, and reserved judgment on the use of the life tables. At no time did the respondent reveal to defense counsel, the judge, or his own expert the information concerning Pina's HIV condition.

The following day, prior to the opening statements of counsel, at a lobby conference, the judge discussed the preliminary instructions he intended to give the jury. On the issue of damages, the judge informed counsel that he would instruct the jury that "damages may include compensating [Pina for] the value of his life to himself, his lost earnings based on the probable duration of his life and any physical and emotional pain and suffering endured by . . . Pina prior to his death." Again, the respondent did not disclose that Pina had been HIV positive since May, 1988.

On February 12, 1996, Gonsalves disclosed, during her cross-examination, that Dr. Chowdri had treated Pina for hepatitis. One of the defense attorneys knew, apparently for reasons unrelated to this trial, that, for some time, Dr. Chowdri was the only doctor in New Bedford who treated persons who tested positive for HIV and persons with AIDS. Consequently, defense counsel served Dr. Chowdri with a subpoena and learned, on February 13, 1996, for the first time, that Pina had tested positive for HIV. From copies of correspondence between Dr. Chowdri and the respondent's office, defense counsel also learned that the respondent had known of Pina's HIV condition since June, 1991. On February 13, the respondent had Gonsalves obtain an unredacted set of Pina's medical records from St. Luke's Hospital.

The judge convened a lobby conference at which the admission of the records from St. Luke's Hospital was discussed. The respondent produced the redacted records, telling the judge that he had received them from one of the defense counsel. After the

judge asked if there was a dispute over the records' "completeness," the respondent disclosed that the records had been redacted to delete reference to Pina's HIV condition. The respondent did not immediately disclose to the judge the date he had first learned of Pina's HIV condition, but, on direct questioning, he revealed that he knew of Pina's condition prior to responding to discovery. The judge refused to allow the respondent to introduce the unredacted records, but permitted defense counsel to introduce the records and to cross-examine Gonsalves on the issue of Pina's HIV status. The judge also refused to permit the respondent to use the life tables. The judge reserved judgment on additional sanctions until after the trial's completion.

Following trial, defense counsel filed a joint motion for sanctions against the respondent and Gonsalves, alleging that they had deliberately withheld information concerning Pina's HIV status during discovery and trial. After a hearing, the judge entered an order in which he found that the respondent had "engaged in a pattern of activity to hide [Pina's HIV status] from the defendants and initially . . . from the court," and had engaged in deliberate misconduct in connection with Gonsalves's responses to the defendants' interrogatories. The judge ordered that his opinion finding misconduct be published, and that the respondent pay a sanction of $15,000, which the respondent paid. The judge declined to refer the matter to the board.

2. Bar counsel filed with the board a petition for discipline against the respondent. The matter was referred to a hearing committee of the board. After a hearing, the hearing committee determined that the respondent had violated S.J.C. Rule 3:07, Canon 1, DR 1-102 (A) (4), (5), and (6), as appearing in 382 Mass. 769 (1981),[5] by assisting Gonsalves in preparing answers to the Joyce interrogatories that he knew were either false, misleading, or both, and by permitting Gonsalves to sign those

[5]Supreme Judicial Court Rule 3:07, Canon 1, DR 1-102 (A), as appearing in 382 Mass. 769 (1981), provides: "A lawyer shall not: . . . (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation. (5) Engage in conduct that is prejudicial to the administration of justice. (6) Engage in any other conduct that adversely reflects on his fitness to practice law."

answers under the pains and penalties of perjury. The hearing committee also found that the respondent's failure to disclose Pina's HIV condition during the hearing on his request to prove hedonic damages, particularly in light of his failure to claim a privilege, also violated DR 1-102 (A) (4), (5), and (6). In its review,[6] the board adopted these conclusions of law. The hearing committee further determined that this same conduct did not violate S.J.C. Rule 3:07, Canon 7, DR 7-102 (A) (3) and (7), as appearing in 382 Mass. 785 (1981).[7] The board disagreed with the latter determination, and modified the hearing committee's conclusions to find these disciplinary violations as well.

As to the appropriate sanction, the board agreed with the committee that there were relevant mitigating circumstances, including: "the 'extraordinarily contentious nature of the proceedings' and [that] the respondent's personal feelings toward the mistreatment of a fellow Cape Verdean led him to become obsessed with the case and to impugn the motives of opposing counsel; . . . that defense counsel, acting with due diligence, should have recovered the concealed information on their own; . . . that the respondent had already suffered greatly, both personally and professionally, by the [published] sanction order and its attendant publicity; and . . . that he was not motivated by personal financial interests." In addition, the board agreed with the hearing committee that the novel issues regarding the nature and scope of the statutory protection under G. L. c. 111, § 70F,[8] accorded to those diagnosed with HIV "should be weighed in mitigation . . . particularly . . . where the very

[6]Only bar counsel sought an appeal, which was heard by the entire board (as opposed to an appeals panel).

[7]Supreme Judicial Court Rule 3:07, Canon 7, DR 7-102 (A), as appearing in 382 Mass. 785 (1981), provides: "In his representation of a client, a lawyer shall not: (3) Conceal or knowingly fail to disclose that which he is required by law to reveal. . . . (7) Counsel or assist his client in conduct that the lawyer knows to be illegal or fraudulent."

[8]General Laws c. 111, § 70F, provides, in relevant part: "No health care facility . . . and no physician or health care provider shall (1) test any person for the presence of the HTLV-III antibody or antigen without first obtaining his written informed consent; (2) disclose the results of such test to any person other than the subject thereof without first obtaining the subject's written informed consent; or (3) identify the subject of such tests to any person without first obtaining the subject's written informed consent."

act of invocation [of a privilege under the statute] would have given away the game and stripped Pina of the privilege." The board disagreed with the hearing committee that "the perceived rightness of the respondent's cause in prosecuting the lawsuit," and the fact that the lawsuit benefited an under-served community, were appropriate mitigating circumstances. The board's recommendation did not turn on those factors. The board, after considering the circumstances it found mitigating, adopted the hearing committee's recommendation that the respondent receive a public reprimand.

3. We generally afford substantial deference to the board's recommended disciplinary sanction. *Matter of Foley*, 439 Mass. 324, 333 (2003), and cases cited. Nonetheless, we must decide each case "on its own merits and every offending attorney must receive the disposition most appropriate in the circumstances." *Matter of the Discipline of an Attorney*, 392 Mass. 827, 837 (1984). If comparable cases exist in Massachusetts, we apply the markedly disparate standard in imposing a sanction. *Matter of Finn*, 433 Mass. 418, 423 (2001). See *Matter of the Discipline of an Attorney, supra* at 834. We also consider mitigating factors. *Matter of Finn, supra* at 424.

Bar counsel argues that a two-year suspension should be imposed, noting that a one-year suspension is the presumptive sanction for making intentional misrepresentations to opposing counsel and the court. The respondent argues that the sanction imposed by the board — a public reprimand — should be the sanction. In arguing their respective positions, the parties have brought several disciplinary cases to our attention. The cases are helpful, but none is determinatively comparable to the circumstances present here.[9]

It is sufficient to say, however, that the respondent's conduct

[9]In seeking a suspension, bar counsel relies on the following cases: see *Matter of Shuman*, 437 Mass. 1006, 1006 (2002) (affirming six-month suspension on attorney who, in documents to court, described expert's expected testimony despite never having communicated with that expert about case); *Matter of McCarthy*, 416 Mass. 423, 423-426 (1993) (imposing one-year suspension on attorney who elicited false testimony and introduced false documents to rent control board); *Matter of Neitlich*, 413 Mass. 416, 422 (1992) (imposing one-year suspension on attorney who had "perpetrate[d] a fraud on the [Probate Court] and opposing counsel" by failing to make full disclosure of, and by actively misrepresenting, terms of his client's pending

is grave enough to warrant a suspension of some duration. The respondent's material omissions, made in the course of affirmative discovery requests, constitute a form of misrepresentation, a serious ethical violation by itself. What makes the conduct even more serious is its intentional nature. Despite having obtained evidence to the contrary, the respondent permitted Gonsalves to provide answers to interrogatories that were false. He also failed to produce, despite a specific request for medical records, the records he had obtained from Dr. Chowdri. The fact that the respondent may have believed that he had a duty under G. L. c. 111, § 70F, to protect Pina's HIV condition while seeking hedonic damages on Pina's behalf is not relevant. The statute did not preclude the respondent from disclosing Dr. Chowdri's name or the identity of St. Luke's Hospital, and the respondent does not argue to the contrary. The fact that the respondent withheld the information because he believed the disclosure of Pina's HIV condition was privileged under the statute is also of no consequence. He should have objected to the discovery requests and asserted a privilege, leaving to the judge the resolution of any issues concerning the application of § 70F.

Further, the respondent's conduct was also quite serious because of its potential to obstruct justice. The respondent's actions threatened the integrity of the trial because they prevented

real estate transaction in postdivorce proceeding); *Matter of Joyce,* 13 Mass. Att'y Discipline Rep. 302, 302-305 (1997) (imposing one-year suspension on attorney who falsely represented to opposing counsel, a third party, and a court-appointed master that his client had deposited certain funds with him in compliance with order entered by Superior Court judge); *Matter of Giuliotti,* 10 Mass. Att'y Discipline Rep. 133, 134, 137 (1994) (imposing one-year suspension on attorney who signed expert's name to affidavit and filed it with court offering opinion that expert had not rendered). See also *Florida Bar* v. *Burkich-Burrell,* 659 So. 2d 1082, 1084 (Fla. 1995) (imposing thirty-day suspension for failing to disclose material facts to opposing counsel during discovery); *Mississippi Bar* v. *Land,* 653 So. 2d 899, 909-910 (Miss. 1994) (imposing one-year suspension on attorney who deliberately concealed evidence with intent to deprive opposing counsel and client from pursuing claim). In urging us to affirm the board's imposition of a public reprimand, the respondent cites *Matter of the Discipline of Attorneys A & B,* 2 Mass. Att'y Discipline Rep. 123, 125-126 (1981) (imposing private reprimand for submitting inadequate discovery response); *Matter of Mahlowitz,* 1 Mass. Att'y Discipline Rep. 189, 192 (1979) (imposing public censure on lawyer who "permitted [a] probate judge to act on several occasions under . . . misapprehension").

the judge from fashioning complete and appropriate preliminary instructions to the jury and also may have affected the judge's evidentiary rulings on the issue of damages. It is of significance that our decision to impose a suspension finds support in the recommendations of the ABA Standards for Imposing Lawyer Sanctions § 6.12 (1986) (recommending suspension when lawyer knows that false statements are being submitted to court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to party, or causes adverse or potentially adverse effect on legal proceeding).

4. We come to the length of the suspension. Weighing the serious misconduct that occurred against the factors we find mitigating, we conclude that a one-year suspension should be imposed. As to mitigation, we agree with bar counsel that the respondent's obsession with the case and the contentious nature of the proceedings are not mitigating factors. See *Matter of McCarthy*, 416 Mass. 423, 429-430 n.3 (1993) (noting that pressure of litigation, including getting "caught up" in "heated and chaotic hearing," does not justify misconduct); *Matter of Neitlich*, 413 Mass. 416, 422 (1992) (rejecting respondent's argument that circumstance of contentious nature of proceeding should be factored in determining sanction). Litigation is often contentious, and emotions and stress are natural. Lawyers, nonetheless, despite the tension of litigation, are always responsible for maintaining the ethical standards of the profession, *Borman* v. *Borman*, 378 Mass. 775, 787 (1979), and to that end, they must retain composure and objectivity. We also reject as mitigating opposing counsel's independent failure to discover the requested information. See *Matter of Finnerty*, 418 Mass. 821, 829 (1994) (finding immaterial that opposing counsel had stipulated to misrepresented valuation of law practice). We also do not consider mitigating the respondent's claim that "novel issues regarding the nature and scope of the statutory protection under G. L. c. 111, § 70F" counselled against disclosure. As previously has been explained, the statute does not prohibit the disclosure of the identity of a treating physician or the name of a hospital in which a person had been admitted, and the respondent had lawful procedures, had he chosen to invoke them, to raise the matter of privilege.

While we consider the length of time the respondent permitted his concealment of information to stand, *Matter of Nunes*, 13 Mass. Att'y Discipline Rep. 584, 587 (1997); *Matter of Aufiero*, 13 Mass. Att'y Discipline Rep. 6, 26 (1997), we give some consideration to the respondent's eventual disclosure of the information. Although it is a close point, some mitigation exists by reason of the publicity surrounding the published opinion of the Federal trial judge sanctioning the respondent, see *Matter of Grossman*, 3 Mass. Att'y Discipline Rep. 89, 90 (1983), and the significant monetary fine paid by the respondent.

The one-year suspension is based on the foregoing considerations, and takes into account the "primary factor" of the "effect upon, and perception of, the public and the bar," *Matter of Finnerty*, *supra* at 829, quoting *Matter of Alter*, 389 Mass. 153, 156 (1983). We advise for future reference that this sanction is tailored to the factors in this case and the novelty of the issues. Counsel who engage in similar misconduct in the future should not necessarily expect a maximum sanction of a one-year suspension. We emphasize that "[a]n effective judicial system depends on the honesty and integrity of lawyers who appear in their tribunals." *Matter of Finnerty*, *supra*. This principle applies not only to trials, but also to trial preparation and discovery. Conduct such as the respondent's corrodes these obligations.

5. We remand the case to the county court for entry of a judgment suspending the respondent from the practice of law for a period of one year. The respondent shall comply with S.J.C. Rule 4:01, § 17, as amended, 426 Mass. 1301 (1997), and S.J.C. Rule 4:01, § 18, as appearing in 430 Mass. 1329 (2000). The respondent shall reimburse the board in the amount of $3,958.17 for costs expended in the disciplinary proceedings.

*So ordered.*